**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| SHELLEY R. PONIST, individually and as Administratrix of the ESTATE OF ZACHARY J. SAHM, | : : : : | No. 2:25-cv-804 |
| Plaintiffs, | : : | **JURY TRIAL DEMANDED** |
| v. | : : | |
| ALLEGHENY COUNTY, WARDEN ORLANDO HARPER, ALLEGHENY HEALTH NETWORK, WILLIAM K. JOHNJULIO, MD, LISA KUDRAV, RN, KATHLEEN GIBBONS, PA, TORI PIPAK, PA, MICHAEL ELIC, RN, ANDREW KUZNETSOV, ADON, JENNIFER STEPIC, ADON, PAUL SCHULTZ, RN, SARAH SIMERLY, NP, WENDY FICHTER, CNA, MARY THOMPSON, CNA, OFFICER TORRY HAWKINS, [FNU] WILLIAMS, THE CITY OF PITTSBURGH, PITTSBURGH BOROUGH OF EMERGENCY SERVICES, BENJAMIN BOWMAN, DANIEL SPROUSE, EUGENIO DINNOCENTE, CHRISTOPHER DOBBINS, LEONARD WEISS, JOHN AND JANE DOES 1-10, JOHN AND JANE DOES LOCUM TENENS, JACK AND JILL ROES 1-10, AND JOHN AND JANE ROES 1-10, | : : : : : : : : : : : : : : : : : : : : : : : | |
| Defendants. | : : | |

## COMPLAINT

Plaintiff, Shelly R. Ponist, individually and as Administratrix of the Estate of

Zachary J. Sahm, by her counsel, hereby files this Complaint as follows:

## INTRODUCTION

1.     For years Defendant Allegheny Health Network ("AHN") and Defendant Allegheny County created a culture at the Allegheny County Jail ("ACJ") where the very fact that an incarcerated person has a mental illness, intellectual disability, or neurodevelopmental disorder meant that they were punished instead of treated. And for incarcerated persons who simultaneously had either mental illness, intellectual disability, or neurodevelopmental disorder with some other chronic care needs, the culture that AHN and Allegheny County created at ACJ guaranteed that those individuals were discriminated against, and that their medical needs were not met. The confluence of those unmet medical needs at the ACJ became a proverbial death sentence for incarcerated persons. From at least March 2020 through September 2023, that culture killed at least 20 incarcerated persons.

2.     Zachary Sahm was 26 years old when this culture took his life. He entered ACJ with diagnoses of opioid use disorder and opioid withdrawal. Almost at once, he was stripped of his ability to receive adequate medical care at ACJ because of his opioid use disorder. While he was placed in ACJ's detoxification protocol, AHN and Allegheny County, and their employees and/or agents, completely failed to manage his opioid withdrawal. Days later, after AHN and Allegheny County allowed his opioid withdrawal to worsen, Zachary died of complications related to his opioid withdrawal.

3.    The ultimate tragedy to Zachary's story is that he was the 20th preventable death in 3 years reported at ACJ that was caused by AHN and Allegheny County's inadequate medical care and their intentional discrimination against individuals with disabilities. Many of those deaths happened while Defendant William K. Johnjulio, MD served as ACJ's interim Medical Director. AHN and Allegheny County knew that incarcerated persons with mental illnesses, intellectual disorders, neurodevelopmental disorders, and chronic care needs were not receiving adequate treatment. Instead of doing anything about it, AHN reaped the benefits of millions of dollars a year through its contract with Allegheny County while severely understaffing ACJ so that prompt medical care was unable to even be provided.

## JURISDICTION AND VENUE

4.    This action is brought pursuant to 42 U.S.C. § 1983, the Fourteenth Amendment of the United States Constitution, Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131, *et seq.* ("ADA"), and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 1331*, et seq.* Jurisdiction is founded on 42 Pa.C.S.A. 931 (a).

5.    All claims herein arose within the jurisdiction of the United States District Court for the Western District of Pennsylvania and involve Defendants acting under color of law and who reside within its jurisdictional limits. Venue is accordingly invoked pursuant to the dictates of 28 U.S.C. § 1391(b) and (c).

3

## PARTIES

6.      Zachary J. Sahm was an adult individual who resided in Pennsylvania.

7.      Shelley R. Ponist is the mother of Zachary Sahm who was appointed Administratrix of his Estate by the Clearfield County Register of Wills.

8.      Allegheny Health Network ("AHN") is a Pennsylvania nonprofit corporation with a principal place of business at 120 Fifth Avenue, Suite 2900, Pittsburgh, Pennsylvania 15222. At all relevant times, AHN was acting by and through its duly authorized employees, agents, and/or administrators, who at all relevant times were acting within the course and scope of their employment, under color of state law, and in accordance with its policies, practices, and customs. At all relevant times, AHN contracted with Allegheny County to provide medical care and treatment on its behalf to incarcerated people at ACJ. Under contract, AHN and Allegheny County were mutually responsible for adopting, implementing, and enforcing policies and procedures for medical care for incarcerated people at ACJ. AHN and Allegheny County also entered a partnership whereby AHN provides Allegheny County with hospital and specialty services to individuals at ACJ.

9.      At all relevant times, all physicians, nurses, behavioral health specialists, clinical providers, physician assistants, psychologists, psychiatrists, and other healthcare personnel who observed, cared for and/or treated Zachary at ACJ were the agents, ostensible agents, servants, representatives, and/or employees of AHN, and were acting while in and upon the business of AHN and while in the course and scope of their employment. The professional liability claims asserted against AHN are for the

professional negligence of all its actual, apparent, and/or ostensible agents, servants and employees who participated in the care, treatment, management, and clinical decision-making for Zachary at ACJ. The professional liability claims being asserted against them include direct claims for corporate negligence. AHN had actual or constructive notice of the actions of its agents, ostensible agents, servants, representatives, and/or employees.

10. William K. Johnjulio, MD ("Johnjulio") is an adult individual who, at all relevant times, was employed by AHN to practice as a physician at ACJ. At all relevant times, Johnjulio served as the Interim Medical Director, was a final policymaker for decisions concerning health services, and supervised and authorized the medical programs and care that were provided at ACJ. At all relevant times, Johnjulio was acting under color of state law through his employment to provide medical care at ACJ, and in accordance with the policies, customs, and/or practices of AHN. Johnjulio is sued in his individual and official capacity.

11. Lisa Kudrav, RN is an adult individual who, at all relevant times, was employed by AHN to exclusively practice as a nurse at ACJ and acting within the course and scope of her duties. At all relevant times, Nurse Kudrav was acting under color of state law through her employment to provide medical care at ACJ, and in accordance with the policies, customs, and/or practices of AHN. Nurse Kudrav is sued in her individual capacity.

12.     Kathleen Gibbons, PA is an adult individual who, at all relevant times, was employed by AHN to exclusively practice as a physician's assistant at ACJ and acting within the course and scope of her duties. At all relevant times, PA Gibbons was acting under color of state law through her employment to provide medical care at ACJ, and in accordance with the policies, customs, and/or practices of AHN. PA Gibbons is sued in her individual capacity.

13.     Tori Pipak, PA is an adult individual who, at all relevant times, was employed by AHN to exclusively practice as a physician's assistant at ACJ and acting within the course and scope of her duties. At all relevant times, PA Pipak was acting under color of state law through her employment to provide medical care at ACJ, and in accordance with the policies, customs, and/or practices of AHN. PA Pipak is sued in her individual capacity.

14.     Michael Elic, RN is an adult individual who, at all relevant times, was employed by AHN to exclusively practice as a nurse at ACJ and acting within the course and scope of his duties. At all relevant times, Nurse Elic was acting under color of state law through his employment to provide medical care at ACJ, and in accordance with the policies, customs, and/or practices of AHN. Nurse Elic is sued in his individual capacity.

15.     Andrew Kuznetsov, ADON is an adult individual who, at all relevant times, was employed by AHN to exclusively practice as a nurse at ACJ and acting within the course and scope of his duties. At all relevant times, Nurse Kuznetsov was acting under color of state law through his employment to provide medical care at ACJ,

and in accordance with the policies, customs, and/or practices of AHN. Nurse Kuznetsov is sued in his individual capacity.

16.     Jennifer Stepic, ADON is an adult individual who, at all relevant times, was employed by AHN to exclusively practice as a nurse at ACJ and acting within the course and scope of her duties. At all relevant times, Nurse Stepic was acting under color of state law through her employment to provide medical care at ACJ, and in accordance with the policies, customs, and/or practices of AHN. Nurse Stepic is sued in her individual capacity.

17.     Paul Schultz, RN is an adult individual who, at all relevant times, was employed by AHN to exclusively practice as a nurse at ACJ and acting within the course and scope of his duties. At all relevant times, Nurse Schultz was acting under color of state law through his employment to provide medical care at ACJ, and in accordance with the policies, customs, and/or practices of AHN. Nurse Schultz is sued in his individual capacity.

18.     Sarah Simerly, NP is an adult individual who, at all relevant times, was employed by AHN to exclusively practice as a nurse practitioner at ACJ and acting within the course and scope of her duties. At all relevant times, Nurse Simerly was acting under color of state law through her employment to provide medical care at ACJ, and in accordance with the policies, customs, and/or practices of AHN. Nurse Simerly is sued in her individual capacity.

19.    Wendy Fichter, CNA is an adult individual who, at all relevant times, was employed by AHN to exclusively practice as a nurse assistant at ACJ and acting within the course and scope of her duties. At all relevant times, Fichter was acting under color of state law through her employment to provide medical care at ACJ, and in accordance with the policies, customs, and/or practices of AHN. Fichter is sued in her individual capacity.

20.    Mary Thompson, CNA is an adult individual who, at all relevant times, was employed by AHN to exclusively practice as a nurse assistant at ACJ and acting within the course and scope of her duties. At all relevant times, Thompson was acting under color of state law through her employment to provide medical care at ACJ, and in accordance with the policies, customs, and/or practices of AHN. Thompson is sued in her individual capacity.

21.    John and Jane Does 1-10 are unknown adult individuals who, at all relevant times, were employed by AHN to exclusively practice as medical providers at ACJ and acting within the course and scope of their duties. At all relevant times, John and Jane Does 1-10 were acting under color of state law through their employment to provide medical care at ACJ, and in accordance with the policies, customs, and/or practices of AHN. John and Jane Does 1-10 are sued in their individual capacities.

22.    The individual AHN Defendants, including Johnjulio, and John and Jane Does 1-10 are collectively referred to as the "Medical Defendants."

23.     Defendant John Doe Locum Tenens is an unknown physician staffing agency who was employed by AHN and Allegheny County to find, recruit, and hire the Medical Defendants.

24.      Allegheny County is a county government organized and existing under the laws of the Commonwealth of Pennsylvania with a principal place of business at 436 Grant Street, Pittsburgh, Pennsylvania 15219. Allegheny County runs ACJ at 950 Second Avenue, Pittsburgh, Pennsylvania 15219. At all relevant times, Allegheny County was acting by and through its duly authorized employees, agents and/or administrators of ACJ, who at all relevant times were acting within the course and scope of their employment, under color of state law, and in accordance with Allegheny County's policies, practices and customs. Although Allegheny County contracts with AHN for medical services at ACJ, it also supplies medical personnel to ACJ like licensed practical nurses, infectious disease directors and coordinators, assistant directors of nursing, health services administrators, directors of nursing, mental health specialists, and registered nurses. Allegheny County also supplies custodial staff to ACJ for safety and security purposes. Allegheny County intentionally puts itself into a position to understand, control, and supervise both medical and custodial needs at ACJ.

25.     Warden Orlando Harper is an adult individual who, at all relevant times, was employed by Allegheny County as ACJ's Warden. At all relevant times, Warden Harper was acting under color of state law through his employment with Allegheny County and acting within the course and scope of his duties. Warden Harper had final policymaking authority for ACJ and Allegheny County and was responsible for

overseeing all operations at ACJ including the provision of healthcare to inmates, and approving and adopting policies and procedures among others. Warden Harper is sued in his individual capacity.

26.     AHN, Allegheny County, and Warden Harper are collectively referred to as the "Municipal Defendants."

27.     Torry Hawkins is an adult individual who, at all relevant times, was employed by Allegheny County as a corrections officer at ACJ and acting within the course and scope of her duties. At all relevant times, Hawkins was acting under color of state law through his employment with Allegheny County. Hawkins is sued in his individual capacity.

28.     [FNU] Williams is an adult individual who, at all relevant times, was employed by Allegheny County as a corrections officer at ACJ and acting within the course and scope of their duties. At all relevant times, Williams was acting under color of state law through his employment with Allegheny County. Williams is sued in their individual capacity.

29.     Jack and Jill Roes 1-10 are unknown adult individuals who, at all relevant times, were employed by Allegheny County as corrections officers at ACJ and acting within the course and scope of their duties. At all relevant times, Jack and Jill Roes 1-10 were acting under color of state law, and in accordance with the policies, customs, and/or practices of Allegheny County and ACJ. Jack and Jill Roes 1-10 are sued in their individual capacities.

30.    Hawkins, Williams, Jack and Jill Roes 1-10 are referred to as the "Corrections Defendants."

31.    Pittsburgh Borough of Emergency Medical Services ("Pittsburgh EMS") is a non-profit government corporation in the Commonwealth of Pennsylvania with its headquarters located at 700 Filbert Street, Pittsburgh, PA 15232.

32.    The City of Pittsburgh (the "City") is a Pennsylvania local government entity that is funded by tax revenues as well as grants from the Commonwealth of Pennsylvania, and as such acts under color of state law. The City's headquarters are located at 414 Grant Street, Pittsburgh, PA 15219. Pittsburgh EMS falls under the City's Department of Public Safety.

33.    The City is governed by a 9 person board of commissioners and mayor. Pittsburgh EMS is governed by the City's Public Safety and Wellness Committee which is chaired by a member of the City's board of commissioners. The City's own website provides that the Public Safety and Wellness Committee has "charge of and jurisdiction over all ordinances, resolutions, bills, papers, and other matters of every kind pertaining to [Emergency Medical Services]."

34.    The City and Pittsburgh EMS are functionally the same entity, sharing revenues, expenses, property, budgets, leadership, policies, and personnel. The City's annual budget shows shared revenues with Pittsburgh EMS, and shared expenses. Shared expenses include FICA payments, salaries for administration, medical and dental fees, training fees, and gasoline.

35.    Pittsburgh EMS also receives grants from the Commonwealth of Pennsylvania, Allegheny County, and the City, and as such functions as an agent of the Commonwealth of Pennsylvania, Allegheny County, and the City. Pittsburgh EMS is the EMS provider for the City and surrounding areas within Allegheny County including ACJ.

36.    The City and Pittsburgh EMS are collectively referred to as the "City Defendants."

37.    Benjamin Bowman is an adult individual who, at all material times, was a Pittsburgh EMS paramedic employed by the City and acting within the course and scope of his duties. At all material times, Bowman was acting under color of state law. Bowman is sued in his individual capacity.

38.    Daniel Sprouse is an adult individual who, at all material times, was a Pittsburgh EMS paramedic employed by the City and acting within the course and scope of his duties. At all material times, Sprouse was acting under color of state law. Sprouse is sued in his individual capacity.

39.    Eugenio Dinnocente is an adult individual who, at all material times, was a Pittsburgh EMS paramedic employed by the City and acting within the course and scope of his duties. At all material times, Dinnocente was acting under color of state law. Dinnocente is sued in his individual capacity.

40.    Christopher Dobbins is an adult individual who, at all material times, was a Pittsburgh EMS paramedic employed by the City and acting within the course and scope of his duties. At all material times, Dobbins was acting under color of state law. Dobbins is sued in his individual capacity.

41.    Leonard Weiss is an adult individual who, at all material times, was a Pittsburgh EMS paramedic employed by the City and acting within the course and scope of his duties. At all material times, Weiss was acting under color of state law. Weiss is sued in his individual capacity.

42.    The individual Pittsburgh EMS Defendants are collectively referred to as the "Paramedic Defendants."

43.    John and Jane Roes 1-10 are Pittsburgh Bureau of Emergency Medical Services emergency dispatchers who at all material times were employed by the City of Pittsburgh. At all material times, John and Jane Roes 1-10 were acting under color of state law. John and Jane Roes 1-10 are sued in their individual capacities.

44.    John and Jane Roes 1-10 are collectively referred to as the "Dispatcher Defendants."

## FACTS

### *Inadequate Medical Care at ACJ*

45.     On September 9, 2023, Zachary was committed to ACJ.

46.     Zachary was a pretrial detainee at all relevant times.

47.     Upon his entry to ACJ, Zachary received a drug screening by the Medical Defendants and tested positive for fentanyl and heroin use.

48.     Zachary also admitted to his daily fentanyl and meth use, having used less than 6 hours prior to his detention, and was suffering from obvious signs of opioid withdrawal.

49.     Zachary was identified by the Medical Defendants as having opioid use disorder.

50.     Because of Zachary's presentation and opioid use disorder, he was housed on ACJ's first level, wore an identification card that designated him as a detoxing inmate, and placed on an opioid detoxification protocol ("detox protocol") where he should have been subject to higher intervals of supervision and received medical treatment for his opioid use disorder and opioid withdrawal symptoms pursuant to the Municipal Defendants' own policies and procedures.

51.     The Municipal Defendants' policies and procedures provide that those inmates in the detox protocol, such as Zachary, must be clinically assessed at least *twice* per day for a Clinical Opiate Withdrawal Score (COWS) and vitals such as blood pressure, pulse, temperature, hydration etc. These assessments must be documented.

52.     However, Zachary was only assessed by the Medical Defendants once per day.

53.     The Municipal Defendants' policies and procedures also provide that inmates in the detox protocol, such as Zachary, must be monitored every 15 minutes by the CO Defendants to ensure their safety and well-being.

54.     While the CO Defendants documented that they performed wellness checks on Zachary every 15 minutes, these checks were generally performed infrequently or not at all.

55.     The Medical Defendants also placed Zachary on a regime of Hydroxyzine, Loperamide, Clonidine, Promethazine, and Ondansetron to treat his opioid withdrawal.

56.     In patients suffering from acute opioid withdrawal, such as Zachary, persistent vomiting and diarrhea may result, if untreated, in dehydration, hypernatremia (elevated blood sodium level), and resultant heart failure and death which is why frequent medical assessments and wellness checks are so critical.

57.     Because of these symptoms associated with opioid withdrawal, the Medical Defendants were required to routinely monitor and document Zachary's fluid intake as well as his subjective feelings/complaints to ensure his safety, but they never did at any point during Zachary's incarceration.

58.     Further, because Zachary was prescribed clonidine, an antihypertensive used to attenuate withdrawal symptoms with a known risk of lowering blood pressure, the Medical Defendants were required to routinely monitor Zachary's blood pressure and document their findings to ensure that he did not become hypotensive.

59.    However, the last time that the Medical Defendant's monitored Zachary's blood pressure before his death was September 11, 2023 at 9:50 a.m. by PA Pipak.

60.    On the same day, Zachary was noted as vomiting and having diarrhea with a COWS score of 10 (his initial COWS score was 3) indicating that his withdrawal symptoms were worsening.

61.    Zachary was last evaluated by Nurse Elick on September 12, 2023 at 10:49 a.m., but Nurse Elick did not take Zachary blood pressure or document his fluid intake as he was required to do according to the nursing standard of care and the Municipal Defendants' own policies and procedures.

62.    On September 13, 2023, at or about 7:25 a.m. during a routine wellness round, CO Hirosky found Zachary "lying in his bunk wet and shaking but responsive."

63.    CO Hirosky immediately called ACJ's medical department to report Zachary's medical emergency.

64.    The CO Defendants were acutely aware that Zachary was deteriorating prior to CO Hirosky's discovery, but were deliberately indifferent to his emergent medical needs.

65.    At this time, Zachary was suffering from acute heart failure due to a combination of severe hydration secondary to his opioid withdrawal and the side effects of Clonidine.

66.    Nurse Stepic called 911 to report Zachary's emergency at 7:28 a.m.

16

67.    Nurse Stepic communicated to the Dispatcher Defendants that Zachary was severely hypotensive, vomiting, pale, cool to the touch, weak, had dilated eyes, had difficulty breathing even with oxygen, had a 92% oxygen saturation, and that they were unable to obtain IV access.

68.    However, the Dispatcher Defendants classified Nurse Stepic's call as non-emergent even though Nurse Stepic communicated that Zachary's condition was critical.

69.    At the time of Nurse Stepic's 911 call, the responding Paramedic Defendants were located at the Pittsburgh Bureau of Fire Station, Engine 12, 4156 Winterburn Avenue, Pittsburgh, PA 15207 which is approximately 3.6 miles to 4.5 miles away from ACJ, or a 7–10 minute drive *without* lights and sirens.

70.    Nurse Stepic called 911 again at 7:35 a.m. to check on the status of the Paramedic Defendants and to inform the Dispatcher Defendants that Zachary's condition was rapidly deteriorating.

71.    The Dispatcher Defendants did not dispatch the Paramedic Defendants until 7:38 a.m., or 10 minutes after Nurse Stepic's initial call.

72.    ACJ's medical staff began rendering treatment inside Zachary's cell but eventually placed Zachary on a stretcher in anticipation of the Paramedic Defendants' arrival.

73.    Nurse Simerly assessed Zachary and found him severely hypotensive and dehydrated, with a weak pulse, having difficulty breathing, covered in yellow/brown/green emesis, weak and pale, cool to the touch, 96.7 temperature, with a

blood pressure of 87/60 (critically low), experiencing tremors, with dialed pupils, with low blood sugar, and with a 92% blood oxygen saturation.

74.     While waiting for the Paramedic Defendants to arrive, Zachary's blood pressure dropped to 70/52 and his ability to independently breath continued to diminish.

75.     The Paramedic Defendants did not depart their staging location to ACJ until 7:38 a.m.

76.     Nurse Stepic called 911 again at 7:47 a.m. asking the Paramedic Defendants to "step it up."

77.     The Paramedic Defendants finally arrived at ACJ at 7:53 a.m., or 25 minutes after Nurse Stepic's initial call, but did not reach Zachary in ACJ until 7:57 a.m.

78.     Once the Paramedic Defendants met Zachary inside ACJ, he was unresponsive and went into asystole a/k/a flatlined.

79.     The Paramedic Defendants applied defibrillation pads on Zachary, performed 1 round of CPR, and administered epinephrine which resuscitated him.

80.     The Paramedic Defendants did not depart ACJ until 8:47 a.m., or 54 minutes after they initially arrived at ACJ.

81.     The Paramedic Defendants arrived at UPMC-Mercy with Zachary at 8:51 a.m. and transferred his care to the hospital's emergency department at 8:54 a.m.

82.     Sadly, Zachary was pronounced dead at the hospital at 9:17 a.m.

83.     At all relevant times, the Municipal Defendants knew that reasonable modifications to policies, practices, and procedures were necessary to ensure that all medical personnel were able to effectively communicate with and treat Zachary for any medical needs, including, but not limited to, access to medical and mental health services, grievance procedures, housing placement, and classification proceedings.

84.     The Municipal and Medical Defendants were responsible for ensuring that Zachary was placed on ACJ's detoxification protocol where he was supposed to receive medical supervision, frequent wellness checks, and medical treatment during his opioid withdrawal

85.     At all relevant times, ACJ was severely understaffed in both custody and medical personnel.

86.     Under the Municipal Defendants' detoxification protocol, Zachary should have been under more frequent supervision by the Medical and Corrections Defendants and received more frequent opioid detoxication treatment and monitoring from the Medical Defendants which would have prevented his death.

87.     Zachary's death at ACJ was preventable but inevitable because of the inadequate medical care and supervision that he received during his incarceration.

88.     What's more, the Paramedic and Dispatcher Defendants deliberate indifference to Zachary's emergency medical condition increased his risk of harm.

89.     As a direct and proximate cause of the Defendants' conduct, or lack thereof, Zachary suffered from opioid withdrawal, dehydration, and heart failure which took his life.

90.     The conscious pain and suffering that Zachary endured while incarcerated at ACJ lasted 4 days.

91.     The combination of Zachary's medical diagnosis and opioid use disorder put him at greater risk of negative outcomes from matters involving his health care, especially as it involved treating his opioid withdrawal.

### AHN's History of Deaths and Inadequate Medical Care at ACJ

92.     From March 2020 to Zachary's death on September 13, 2023, there were at least 20 confirmed deaths of incarcerated people at ACJ who were under the Municipal Defendants' medical care.

93.     There were also unreported deaths of incarcerated people at ACJ to an extent that they have yet to be discovered.

94.     These unreported deaths were not disclosed by the Municipal Defendants because those inmates were not "declared" dead at ACJ even though their deaths were caused by the Municipal Defendants and their employees/agents.

95.     At all relevant times, Johnjulio was employed as the interim Medical Director of ACJ, and he supervised all medical services given at ACJ by the Municipal Defendants.

96.     Johnjulio handled supervising and ensuring the adequacy of medical services for chronic and mental health care at ACJ on behalf of the Municipal Defendants.

97.    The Municipal Defendants know that individuals with opioid use disorder such as Zachary are some of the most medically vulnerable individuals among the inmate population at ACJ.

98.    At all relevant times, the Medical Defendants knew that Zachary was suffering from opioid use disorder, was actively under the influence of fentanyl and meth upon his arrival to ACJ and demonstrated obvious signs and symptoms of opioid withdrawal yet failed to manage or oversee his opioid detoxification in a manner that met or exceeded the medical standard of care.

99.    Johnjulio, together with the Municipal Defendants, was also responsible for conducting mortality reviews of all deaths involving ACJ.

100.    Neither the Municipal Defendants nor Johnjulio conducted a single mortality review for any death at ACJ from March 2020 through May 2023.

101.    Most deaths involved individuals with mental health and/or chronic care needs such as Zachary.

102.    In fact, 3 of the 4 deaths reviewed in 2023, including Zachary's, occurred in ACJ's detox unit where Zachary died.

103.    During the same timeframe from March 2020 through September 2023, ACJ was significantly understaffed in both its custodial and medical needs. These widespread staffing concerns caused significant delays and/or denials in medical care to the inmate population, including Zachary and each of the prior deaths.

104.     Approximately a year before Zachary's death, ACJ's Oversight Board (the "Oversight Board") conducted a survey through the University of Pittsburgh School of Social Work, consisting of questions to incarcerated people who were incarcerated at ACJ for at least 15 days or more to determine the satisfaction levels of medical services among the inmate population. The Oversight Board exists under Pennsylvania law and oversees ACJ. The Oversight Board is an independent entity responsible for ensuring the safety, health, welfare, and lawful treatment of incarcerated people at ACJ.

105.     The survey was unbiased and supplied no benefit to the incarcerated people except to statistically analyze the adequacy of the medical services being provided at ACJ.

106.     According to the survey, about 66 percent of the 1,418 individuals who responded said they were "very unhappy" or "somewhat unhappy" with ACJ's medical services, citing extensive delays in emergency and routine care, medication administration, and chronic care.

107.     Another survey conducted for the same purpose found that about 60 percent of responding individuals received delayed medical care at ACJ.

108.     The National Commission on Correctional Health Care ("NCCHC") publishes and accredits correctional institutions nationally on matters involving correctional health care.

109.     NCCHC sets minimum requirements for correctional health care.

110.     ACJ claims to follow NCCHC standards in correctional health care.

111.    In 2022, NCCHC found that ACJ did not meet the following *essential* standards in its correctional health care programs in the following ways:

    a.    ACJ failed to conduct adequate administrative meetings and reports to ensure communication among all facility staff members to ensure consistency and to facilitate health care delivery;

    b.    ACJ failed to ensure that its custodial policies and procedures are not in conflict with those of health care;

    c.    ACJ failed to conduct continuous quality improvement programs to ensure expectations under NCCHC standards are met;

    d.    ACJ failed to monitor patients' active medication lists and manage medications when needed;

    e.    ACJ failed to meet the requirements for emergency services and response plans involving medical staff's response to incidents within the facility;

    f.    ACJ failed to adequately screen incarcerated people during receipt/intake, and this failure contributed to individuals being kept in intake for amounts of time that exceed most jail practices, thus placing incarcerated people at risk for not being treated or identified as requiring additional care;

    g.    ACJ failed to adequately provide mental health screening and evaluations;

    h.    ACJ failed to implement policies to ensure that mental health requests were addressed in a timely manner; and

    i.    ACJ failed to ensure that patients with chronic disease and other special needs were managed using evidence-based clinical treatment practices.

112.    In 2022, NCCHC found that ACJ did not meet the following *important* standards in its correctional health care programs in the following ways:

    a.    ACJ failed to conduct mortality reviews or psychological autopsies;

    b.    ACJ failed to report corrective actions related to inmate deaths to its continuous quality improvement program;

    c.    ACJ failed to implement and monitor systemic issues related to the identification of staff-related issues;

    d.    ACJ failed to review adverse clinical events or near-miss clinical incidents as part of the continuous quality improvement program; and

    e.    ACJ failed to establish basic orientation standards or requirements for health care staff.

113.    In 2022, NCCHC informed the Municipal Defendants that it was a priority to "implement a criterion-based chronic care housing unit for those individuals who are more medically fragile and staff it with a registered nurse" because adequate chronic care was not being provided at ACJ.

114.    Indeed, from March 2020 to September 2023, 88 percent of the deaths at ACJ involved individuals who were either identified as requiring chronic care or who should have been identified as such.

115.    Because the Municipal Defendants communicated so inadequately over patient health and safety, NCCHC also instructed them to "institute collaborative briefings after weekends and prior to the following weekend to identify patients on the radar as being at risk or difficult."

116.    In August 2023, at the request of Allegheny County, an NCCHC Resources Team visited ACJ twice to conduct an in-custody death review from deaths occurring in January 2017 to October 2022.

117.    During these visits, representatives from NCCHC:

   a.   interviewed medical and mental health personnel to assesses the changes made since their prior visits in November 2022 as discussed above,
   b.   reviewed intake/receiving processes,
   c.   identified any operational gaps related to accepting, managing, treating, and housing incarcerated individuals with substance use disorders in ACJ and made recommendations to fill those gaps,
   d.   reviewed health records and gain perspective on substance use disorder incidents and facility operations,
   e.   reviewed use and application of the Clinical Institute Withdrawal Assessments and Clinical Opiate Withdrawal Scale (COWS),
   f.   reviewed health records of a sample of patients on detoxification protocols to determine if treatment protocols align with best practices,

g.    reviewed staffing levels related to receiving and detoxification,

h.    examined updated nursing protocols related to receiving and detoxification,

i.    reviewed training materials,

j.    reviewed in-custody death packages of patients who were detoxifying and died in custody,

k.    interviewed key personnel regarding the in-custody deaths of patients with substance use disorder, and

l.    interviewed key personnel to discuss receiving workflows related to substance use disorder and detoxification.

118.    Shockingly, NCCHC confirmed that the Municipal Defendants' policies and procedures required the Medical Defendants to perform twice-daily assessments for inmates in the detox protocol, like Zachary, but that they *were only being performed once per day* which it found to be "inadequate and risk complications." NCCHC strongly urged the Municipal Defendants' to follow their own policies and procedures regarding twice-daily medical assessments.

119.    NCCHC also found that ACJ's hydration procedures for inmates in the detox protocol was "difficult as no drinking cups are available, and the only fluids available are in the vending machine."

120.    NCCHC also found that of the 40 ACJ patients sent to the ER over the preceding 7 months that 57% were undergoing detoxification treatment which "raise[d] concerns about whether detoxification treatment at [ACJ] is adequate."

121.    NCCHC also found that the Municipal Defendants' lacked training for the custodial staff to recognized when someone is "exhibiting a progression in signs of withdrawal [which] can result in missed or delayed opportunities to intervene early in the process and could result in adverse outcomes, including death."

122.   When NCCHC asked two of ACJ's mental health workers about the training they received for substance abuse, they responded that they "aren't nurses" which NCCHC found to be a clear abdication for their responsibility for patients' care.

123.   NCCHC spoke with custody officers and supervisors in the detox areas of ACJ, and throughout the ground floor, to discuss their level of training with respect to recognizing the progression of opioid withdrawal. During these communications, NCCHC "noted a consistent theme of concern over the uptick in the acuity of detainees, especially in the context of opioid withdrawals [and] all expressed similar thoughts about the training element specific to withdrawal signs and symptoms."

124.   NCCHC observed "a sense of complacency among some health staff regarding their role in caring for inmates" and that there needed "to be more knowledge of the signs and symptoms of detoxification."

125.   With respect to the medical services culture at ACJ, NCCHC found:

> While processes appear fragmented and need adjusting to provide efficient, effective care, some health staff seem to consider specific processes as optional, based on our observations and discussions with them. We identified instances where policy specifies processes intended to enhance or ensure patient safety that are not being used. It is unclear why policy and procedure are not being adhered to. Still, we witnessed and were told this on multiple occasions, giving the appearance of complacency or perhaps an emphasis on personal convenience rather than patient care. We observed this culture of noncompliance and pushback throughout our site visit. This culture directly impacts the safety of patients in the facility.
>
> Examples we observed included staff openly stating "we don't do that" when asked about multiple processes codified in policies and procedures or in the direction of administration and leadership. Despite clearly expressed policies and

direction, compliance among health staff is, inexplicably, resisted. What concerned our team was the attitude of a few medical services staff members in crucial line positions, whose lack of adherence to direction and policy was shocking. Unfortunately, our team spoke to a newly hired employee handling receiving screenings who had a poor attitude and openly admitted to already not following policies.

Our team was also advised that staff are boycotting staff meetings. This is disconcerting as staff meetings are used to discuss patient care issues, changes in treatment, and policy changes. We observed a handful of individuals displaying an attitude of labor management and minimizing workloads for personal convenience over concerns for patient care. This presents a significant barrier to providing proper health care within the facility. These staff are insubordinate, exhibit manifest disrespect to their supervisors and administration, and even had a flippant attitude toward our team members while we were on site.

Some of the unionized health staff are making efforts to undermine leadership, specifically Dr. Brinkman, and such efforts are derailing the possibility of providing effective and efficient health care to patients. A specific individual interviewed by one of our team members openly exhibited these characteristics and admitted to insubordination, disrespect, and neglect-of-duty, directly to our team. The same individual has had a litany of personal performance issues addressed through the labor-management processes by her chain of command with minimal accountability upheld by those in higher levels of the chain of command above the jail's medical administration.

Based on the totality of circumstances, it is reasonable to associate this specific individual with the prevailing attitude of other individuals in the health care system of the ACJ, since they are also in a top position in the labor-management association that represents health staff. Notably, this position was not disclosed to our team by this individual, who appeared to want to be perceived as an objective party looking at the facility. It appears to us that the complaints and attitude are intended to derail the administration's efforts to improve health care and even potentially derail accreditation efforts.

\* \* \* \*

<u>The team reviewed health records and observed staff leaving areas of the health record form blank.</u> Examples of incomplete questions included documenting receiving screening and mental health assessments. These essential questions have been developed to ensure thorough documentation and best practices.

126.    One recommendation that NCCHC found to be a top priority for ACJ was the implantation of a "hydration program for those in detoxification housing areas" which the Municipal Defendants did not do in Zachary's case which ended up costing him his life.

127.    Further, since the Municipal Defendants mirrored NCCHC's standard policies and procedures, NCCHC had several recommendations for the Municipal Defendants to better adhere to those policies.

128.    Specifically, Policy J-C-04 titled "Health Training for Correctional Officers" requires that correctional officers are trained to recognize the need to refer an inmate to a qualified health care professional. Compliance indicators require that correctional officers who work with inmates must receive health-related training every 2 years, including intoxication and withdrawal. NCCHC concluded that this standard was not being met.

129.    NCCHC recommended that training needed to be prioritized for officers assigned to critical areas where inmates on the detox protocol are housed as it was critical for officers and supervisors assigned to high-risk areas to receive training that would help them recognize potential issues early on to prevent adverse outcomes.

130.    Policy J-F-04 titled "Medically Supervised Withdrawal and Treatment" requires inmates who are intoxicated or undergoing withdrawal to be appropriately managed and treated. Compliance indicators for this standard require that individuals showing signs of intoxication or withdrawal be monitored by qualified health care professionals using protocols as clinically indicated until symptoms have resolved, and that medical supervision is implemented if the findings from patient monitoring meet the national guidelines to begin prescription medications. NCCHC concluded that this standard was not being met.

131.    NCCHC recommended that the Municipal Defendants implement a hydration program in the detoxification, pre-arraignment, and processing areas and implement a second daily assessment for all individuals on detoxification floors. This was never done and cost Zachary his life.

132.    Consistent with their failures over the medical care being provided to chronically ill inmates at ACJ, the Municipal, Medical, and Corrections Defendants failed Zachary in at least the following ways:

      a.    Failing to screen and identify him as requiring ongoing opioid detoxification treatment consistent with evidence-based standards established for the care and treatment of chronic diseases, other significant health conditions, and disabilities;

      b.    Failing to identify and utilize established guidelines for treating his chronic illnesses aimed at decreasing the frequency and severity of symptoms, including disease progression and improving health care outcomes;

      c.    Failing to create an individualized treatment plan;

      d.    Failing to monitor his condition and status including his hydration and blood pressure;

      e.    Failing to take appropriate action to improve his outcome;

      f.    Failing to clinically justify any deviations from his treatment;

      g.    Failing to consult and prepare adequate housing assignments and

                    program assignments;

h.     Failing to maintain his chronic care needs by classification;
i.      Failing to flag his need for chronic care;
j.      Failing to document his health records;
k.     Failing to monitor his health and withdrawal symptoms;
l.      Failing to adhere to policies and procedures; and
m.    Failing to take emergency action when Zachary's condition was declining.

133.    The Municipal Defendants knew that the lack of adequate preventative care, grossly inadequate staffing, and failure to satisfy most of the NCCHC's healthcare standards created an environment where medical emergencies were likely to occur.

134.    In fact, from March 2020 through September 2023, ACJ had a *confirmed* death rate that was 3 times the national average.

135.    Because of the inadequacies in the Municipal Defendants' medical programs and services, by the time that most medical emergencies at ACJ occur, which were the direct and proximate result of those inadequacies, the likelihood of a successful patient outcome was dramatically decreased if not nonexistent.

136.    In the alternative, the Municipal Defendants inflicted unnecessary and wanton pain and death upon Zachary by failing to train the Medical and Corrections Defendants on at least the following:

a.     assessing the immediate and/or emergency medical concerns of incarcerated persons, including those with opioid use disorder, under their care and custody;
b.     treating the immediate and/or emergency medical concerns of incarcerated persons, including those with opioid use disorder, under their care and custody;
c.     ensuring the immediate and/or emergency medical concerns of incarcerated persons, including those with opioid use disorder, under their care and custody;
d.     communicating among medical and correctional staff on the care, assessment and evaluation of incarcerated persons under their care

and custody;

    e.    reporting medical concerns of incarcerated persons through the chain of command,

    f.    tracking incarcerated persons' responses to prescribed medical regimens;

    g.    documenting in a patient's medical chart;

    h.    identifying the signs and symptoms associated with opioid withdrawal;

    i.    adhering to policies and procedures; and/or

    j.    providing proper oversight of medical regimens.

137.    In the alternative, the Municipal Defendants inflicted unnecessary and wanton pain and death upon Zachary by failing to supervise the Corrections and Medical Defendants and/or their employees, agents, and/or administrators in at least the following ways:

    a.    by understaffing the corrections and medical staff at ACJ;

    b.    by failing to implement and/or enforce policies whereby the medical staff responds to medical requests;

    c.    by failing to ensure appropriate diagnostic testing when necessary or applicable;

    d.    by failing to ensure that diagnostic testing is carried out when ordered;

    e.    by failing to ensure that prescribed medical requests and regimens were implemented;

    f.    by failing to ensure the diagnosis, monitoring, and treatment of incarcerated persons with opioid use disorder and opioid withdrawal;

    g.    by failing to ensure the diagnosis, monitoring, and treatment of serious medical needs of incarcerated persons with psychiatric disabilities;

    h.    by failing to ensure the diagnosis, monitoring, and treatment of serious medical needs of incarcerated persons with neurodevelopmental disorders, including but not limited to autism spectrum disorder;

    i.    by failing to ensure that correctional policies and procedures do not conflict, restrict, and/or deny healthcare of incarcerated persons;

    j.    by failing to ensure that punitive measures were not used in response to requests for medical or mental healthcare;

    k.    by failing to ensure that medical or mental healthcare staff were able to interrupt the use of punitive measures where appropriate;

l.      by failing to conduct adequate mortality reviews to assess whether compliance indicators were being met or inconsistent in how they are being delivered, documented, or communicated;

m.      by failing to assess adverse clinical events or near-miss clinical incidents and inform correctional and medical staff of incidents that occurred because of errors attributed to medical management or near-miss events which were preventable;

n.      by failing to assess correctional and medical staff's response to emergency or man down drills to identify and critique gaps before actual incidents occurred;

o.      by failing to ensure adequate communication among hospital and correctional and medical staff to ensure adequate notification and understanding of the severity of incarcerated persons' medical condition and needs and timely procurement and preparation of resources; and/or

p.      by failing to ensure patients with chronic health conditions were managed using evidence-based clinical treatment practices and that consistent treatment and follow-ups were provided.

138.    In the alternative, the Municipal Defendants and John Doe Locum Tenens inflicted unnecessary and wanton pain and death upon Zachary by failing to adequately screen during the hiring process medical staff including AHN contractors for the proper credentials and qualifications, suspensions, or disciplinary action by a state medical board.

139.    The Municipal Defendants know that their medical and correctional staff will confront situations in which incarcerated persons (like Zachary) have serious medical needs that could involve a difficult choice, the wrong choice of which would

140.    As stated above, Zachary's death could have been avoided had the Municipal Defendants adequately trained or supervised their medical and correctional staff on providing appropriate medical care.

## COUNT I
### Failure to Train or Supervise
### or, in the Alternative, Failure to Adopt Policy
### Under 42 U.S.C. § 1983
### (As to the Municipal Defendants)

141.    All paragraphs herein are incorporated by reference.

142.    The Municipal Defendants inflicted unnecessary and wanton pain upon Zachary by directing and maintaining a custom, practice, or policy of not adopting a policy or procedure to address the immediate and/or emergency medical concerns of incarcerated persons, including those with psychiatric disabilities (like opioid use disorder) under their care and custody.

143.    The absence of any policy in this regard caused Zachary—who had to rely upon jail authorities to treat his medical needs—to suffer from actual physical torture that culminated in his slow, painful and lingering death.

144.    The absence of any policy in this regard caused Zachary to needlessly suffer from opioid withdrawal, which was easily treatable through proper monitoring, until he suffered cardiac arrest.

145.    The absence of any policy in this regard caused there to be no mechanism through which medical staff and/or jail officials had guidance on how, when, and why to treat incarcerated persons' complaints for emergency and/or immediate medical care.

146.    The absence of any policy in this regard caused a needless denial and delay of access to appropriate (or any) medical care, such as proper clinical responses, assessments, examinations, and diagnostic testing to incarcerated persons with serious medical needs.

147.    The absence of any policy in this regard shows deliberate indifference to a pretrial detainee's serious illnesses who is under the care and custody of the ACJ (like Zachary) and was the moving force behind Zachary's death.

148.    In the alternative, the Municipal Defendants inflicted unnecessary and wanton pain upon Zachary by failing to train the Medical Defendants on at least the following:

a.    assessing the immediate and/or emergency medical concerns of incarcerated persons, including those with psychiatric disabilities and/or neurodevelopmental disorders, under their care and custody,

b.    treating the immediate and/or emergency medical concerns of incarcerated persons, including those with psychiatric disabilities and/or neurodevelopmental disorders, under their care and custody,

c.    ensuring the immediate and/or emergency medical concerns of incarcerated persons, including those with psychiatric disabilities and/or neurodevelopmental disorders, under their care and custody,

d.    communicating among medical and correctional staff on the care, assessment and evaluation of incarcerated persons under their care and custody,

e.    reporting medical concerns of incarcerated persons through the chain of command,

f.    tracking incarcerated persons' responses to prescribed medical regimens, and/or

g.    providing proper oversight of medical regimens.

149.    In the alternative, the Municipal Defendants inflicted unnecessary and wanton pain upon Zachary by failing to supervise the Medical Defendants and/or their employees, agents, and/or administrators in at least the following ways:

a.   by understaffing the medical staff at the ACJ,

b.   by failing to implement and/or enforce policies whereby the medical staff responds to medical requests,

c.   by failing to ensure appropriate diagnostic testing when necessary or applicable,

d.   by failing to ensure that diagnostic testing is carried out when ordered,

e.   by failing to ensure that prescribed medical requests and regimens were implemented,

f.   by failing to ensure the diagnosis, monitoring, and treatment of incarcerated persons with infected wounds or serious burns,

g.   by failing to ensure the diagnosis, monitoring, and treatment of serious medical needs of incarcerated persons with psychiatric disabilities,

h.   by failing to ensure the diagnosis, monitoring, and treatment of serious medical needs of incarcerated persons with neurodevelopmental disorders, including but not limited to autism spectrum disorder,

i.   by failing to ensure that correctional policies and procedures do not conflict, restrict, and/or deny healthcare of incarcerated persons,

j.   by failing to ensure that punitive measures were not used in response to requests for medical or mental healthcare,

k.   by failing to ensure that medical or mental healthcare staff were able to interrupt the use of punitive measures where appropriate,

l.   by failing to conduct adequate mortality reviews to assess whether compliance indicators were being met or inconsistent in how they are being delivered, documented, or communicated,

m.   by failing assess adverse clinical events or near-miss clinical incidents and inform correctional and medical staff of incidents that occurred because of errors attributed to medical management or near-miss events which were preventable,

n.   by failing to assess correctional and medical staff's response to emergency or man-down drills to identify and critique gaps before actual incidents occurred,

o.   by failing to ensure adequate communication among hospital and correctional and medical staff to ensure adequate notification and understanding of the severity of incarcerated persons' medical condition and needs and timely procurement and preparation of resources; and/or

p.   by failing to ensure patients with chronic health conditions were managed using evidence-based clinical treatment practices and that consistent treatment and follow-ups were provided.

150.    In the alternative, the Municipal Defendants inflicted unnecessary and wanton pain upon Zachary by failing to adequately screen during the hiring process medical staff including AHN contractors for the proper credentials and qualifications, suspensions, or disciplinary action by a state medical board.

151.    The Municipal Defendants know that their medical and correctional staff will confront situations in which incarcerated persons (like Zachary) have serious medical needs that could involve a difficult choice, the wrong choice of which would likely cause a constitutional violation.

152.    As stated above, Zachary's death could have been avoided had the Municipal Defendants adequately trained or supervised their medical and correctional staff on providing appropriate medical care.

## COUNT II
## Inadequate Screening
## Under 42 U.S.C. § 1983
## (As to Allegheny County, AHN, and John Doe Locum Tenens)

153.    All paragraphs herein are incorporated by reference.

154.    Allegheny County, AHN, and John Doe Locum Tenens failed to adequately screen Johnjulio when he was hired to provide medical services to incarcerated people at ACJ in that they failed to adequately check his background to ensure his competency to provide appropriate medical services to incarcerated people at the ACJ.

155.    Allegheny County, AHN, and John Doe Locum Tenens' failure to adequately screen Johnjulio caused Zachary's death because adequate scrutiny would have led any reasonable policymaker to conclude that it was obvious that hiring Johnjulio would lead to the inadequate provision of medical services to incarcerated people at the ACJ, in violation of the Eight and Fourteenth Amendments to the United States Constitution.

## COUNT III
### Denial and/or Delay of Access to Adequate Medical Care
### Under 42 U.S.C. § 1983
### (As to the Medical Defendants)

156.    All paragraphs herein are incorporated by reference.

157.    Zachary had serious medical needs arising from active opioid withdrawal which was worsened by his opioid use disorder that rendered him unable to independently manage his own healthcare.

158.    The Medical Defendants knew of an excessive risk to Zachary based on the medical information that they learned through Zachary's incarceration, and through information they learned because of their own evaluations of Zachary's serious medical needs.

159.    The Medical Defendants knew that Zachary's opioid use disorder, coupled with his active opioid withdrawal, placed him in a high-risk category for serious medical needs and that this risk was obvious to someone in their position.

160.    The Medical Defendants' denial and/or delay of medical care to Zachary's serious medical needs created a risk of death and did cause Zachary's death.

161.    The Medical Defendants were deliberately indifferent to Zachary's serious medical needs by failing to timely and adequately provide him with medical care.

162.    Zachary suffered conscious pain and suffering and death because of the Medical Defendants' conduct, which was wanton and willful.

### COUNT IV
### Supervisory Liability
### Under 42 U.S.C. § 1983
### (As to Johnjulio and Warden Harper)

163.    All paragraphs herein are incorporated by reference.

164.    At all relevant times, and as described in greater detail above, Johnjulio and Warden Harper directed their subordinates and/or acquiesced in their subordinates' conduct that they knew was violative of Zachary's federal rights.

### COUNT V
### Disability Discrimination
### Under the ADA
### [or in the Alternative, Failure to Accommodate]
### (As to Allegheny County)

165.    All paragraphs herein are incorporated by reference.

166.    Zachary, a qualified individual with documented disabilities described *supra*, was excluded by Allegheny County from the benefits of medical programs and care at the ACJ by reason of his disability and was otherwise subjected to discrimination by Allegheny County by reason of his disability, in violation of the ADA.

167.    Moreover, Allegheny County failed and/or refused to make reasonable modifications in their policies, practices, or procedures to accommodate Zachary's disability-related needs involving medical care at the ACJ, in violation of the ADA.

168.    Because of Allegheny County's conduct in not providing Zachary with proper medical care and/or the benefits and services of the medical programs or care at the ACJ, and in failing to make reasonable modifications to accommodate him, he has suffered actual physical injury, including death.

## COUNT VI
### Disability Discrimination
### Under Section 504 of the RA
### [or in the Alternative, Failure to Accommodate]
### (As to Allegheny County)

169.    All paragraphs herein are incorporated by reference.

170.    ACJ receives federal financial assistance.

171.    For all the reasons found in Count V *supra*, and as described in greater detail above, Allegheny County's conduct toward Zachary violated the RA.

## COUNT VII
### Negligent Hiring and/or Supervision
### (As to John Doe Locum Tenens, AHN, and Johnjulio)

172.    All paragraphs herein are incorporated by reference.

173.    John Doe Locum Tenens, AHN, and Johnjulio had a duty to exercise reasonable care in hiring and/or supervising competent employees to provide medical care to incarcerated people at ACJ.

174.    John Doe Locum Tenens, AHN, and Johnjulio knew or should have known that the Medical Defendants were not competent to provide medical care to incarcerated people at the ACJ, and therefore breached their duty in either hiring them to provide medical care to incarcerated people at ACJ or in failing to supervise him in providing medical care to incarcerated people at ACJ.

175.     As a direct and proximate result of John Doe Locum Tenens, AHN, and Johnjulio's conduct, Zachary suffered actual physical injury, including death.

### COUNT VIII
### Corporate Medical Negligence
### (As to AHN)

176.     All paragraphs herein are incorporated by reference.

177.     At all relevant times, AHN owed the following non-delegable duties to Zachary:

 a. The duty to use reasonable care in the maintenance of safe and adequate facilities and equipment;
 b. The duty to select and retain only competent physicians and nurses;
 c. The duty to oversee all persons who practice medicine and nursing within its walls as to patient care; and
 d. The duty to formulate, adopt, and enforce adequate rules and policies to ensure quality care for the patients.

178.     Zachary relied upon AHN to uphold these duties.

179.     AHN violated these duties in at least the following ways:

 a. Failing to formulate, adopt, and enforce adequate rules and policies, to select and retain competent medical personnel to carry out the same, or to oversee all medical personnel to identify chronically and mentally ill incarcerated people with medical needs (like opioid use disorder);
 b. Failing to formulate, adopt, and enforce adequate rules and policies, to select and retain competent medical personnel to carry out the same, or to oversee all medical personnel to implement or identify adequate precautions for chronically and mentally ill incarcerated people with medical needs (like opioid use disorder);
 c. Failing to formulate, adopt, and enforce adequate rules and policies, to select and retain competent medical personnel to carry out the same, or to oversee all medical personnel for prompt and consistent evaluation of medical needs (like opioid use disorder) for chronically and mentally ill incarcerated people, when identified and/or indicated;

d.   Failing to formulate, adopt, and enforce adequate rules and policies, to select and retain competent medical personnel to carry out the same, or to oversee all medical personnel for medical needs (like opioid use disorder) for chronically and mentally ill incarcerated people;

e.   Failing to formulate, adopt, and enforce adequate rules and policies, to select and retain competent medical personnel to carry out the same, or to oversee all medical personnel for individualized treatment plans addressing both risk-enhancing and protective factors;

f.   Failing to formulate, adopt, and enforce adequate rules and policies, to select and retain competent medical personnel to carry out the same, or to oversee all medical personnel for chronic care and mental health patient follow-ups;

g.   Failing to formulate, adopt, and enforce adequate rules and policies, to select and retain competent medical personnel to carry out the same, or to oversee all medical personnel for establishing treatment plans for medical needs (like opioid use disorder) for chronically and mentally ill incarcerated people;

h.   Failing to formulate, adopt, and enforce adequate rules and policies, to select and retain competent medical personnel to carry out the same, or to oversee all medical personnel for intake, screening, identifying, and supervision of acute and nonacute chronically ill incarcerated people with mental health concerns;

i.   Failing to formulate, adopt, and enforce adequate rules and policies, to select and retain competent medical personnel to carry out the same, or to oversee all medical personnel for monitoring medical needs (like opioid use disorder) for chronically and mentally ill incarcerated people;

j.   Failing to formulate, adopt, and enforce adequate rules and policies, to select and retain competent medical personnel to carry out the same, or to oversee all medical personnel for monitoring housing for chronically and mentally ill incarcerated people;

k.   Failing to formulate, adopt, and enforce adequate rules and policies, to select and retain competent medical personnel to carry out the same, or to oversee all medical personnel for identifying risk factors for medical needs (like opioid use disorder) for chronically and mentally ill incarcerated people;

l.   Failing to formulate, adopt, and enforce adequate rules and policies, to select and retain competent medical personnel to carry out the same, or to oversee all medical personnel for individualized treatment interventions for medical needs (like opioid use disorder) for chronically and mentally ill incarcerated people;

    m.    Failing to formulate, adopt, and enforce adequate rules and policies, to select and retain competent medical personnel to carry out the same, or to oversee all medical personnel so that reliance on individual health and safety is not based solely on the independence of incarcerated people with chronic care needs and neurodevelopmental challenges; and

    n.    Failing to formulate, adopt, and enforce adequate rules and policies, to select and retain competent medical personnel to carry out the same, or to oversee all medical personnel for systematic assessment of medical needs (like opioid use disorder) for chronically and mentally ill incarcerated people.

180.    AHN also violated these duties by, among other things:

    a.    Failing to identify medical needs (like opioid use disorder) for chronically and mentally ill incarcerated people, or those with neurodevelopmental disorders;

    b.    Failing to communicate between correctional and health care personnel on opioid detoxification procedures;

    c.    Failing to provide timely response to urgent medical needs;

    d.    Failing to appropriately respond to urgent medical needs;

    e.    Failing to implement individualized treatment plans;

    f.    Failing to identify risk-enhancing and protective factors;

    g.    Failing to provide comprehensive psychiatric evaluations; and

    h.    Failing to follow-up and/or monitor opioid detoxification.

181.    AHN further violated these duties by, among other things:

    a.    Significantly understaffing providers and non-providers;

    b.    intentionally understaffing mental health professionals when a significant portion of the inmate population suffered from mental illness;

    c.    intentionally understaffing mental health professionals when a significant portion of the inmate population simultaneously suffered from mental illness and chronic care needs;

    d.    failing to implement and/or enforce policies concerning treatment plans for incarcerated people with mental illness and chronic care needs;

    e.    failing to ensure adequate follow-ups and treatment plans for incarcerated people with mental illness and chronic care needs;

    f.    failing to ensure adequate psychiatric evaluations over suicidality; and

    g.    failing to ensure appropriate housing for incarcerated people with mental illness and chronic care needs.

h.    AHN's negligence increased the risk of harm to Zachary.

182.    The actions and omissions as outlined above were wanton, willful and/or taken in reckless disregard of Zacary's rights.

183.    As a direct and proximate result of AHN's conduct, Zachary suffered actual physical injury, including death.

## COUNT IX
### Vicarious Liability
### (As to AHN)

184.    All paragraphs herein are incorporated by reference.

185.    AHN is vicariously liable for the acts, commissions, or omissions of the Medical Defendants, and others who acted and/or failed to act as though AHN performed the acts or failed to perform the acts itself.

186.    AHN is responsible for at least the following negligent acts or omissions of its medical staff, who are their respective agents, ostensible agents, servants, and/or employees, which deviated from the medical standard of care owed to Zachary in some or all the following ways:

    a.    Failing to manage his opioid use disorder and opioid withdrawal;
    b.    Failing to identify risk factors relating to his opioid use disorder and opioid withdrawal;
    c.    Failing to identify overall individualized treatment plans for opioid use disorder and opioid withdrawals;
    d.    Failing to implement adequate individualized treatment plans for opioid use disorder and opioid withdrawals;
    e.    Failing to implement individualized treatment interventions,
    f.    Failing to screen for risks associated with the chronically and mentally ill as it relates to opioid use disorder and opioid withdrawals;
    g.    Failing to perform evaluations at clinically relevant or critical times;

| | |
|---|---|
| h. | Failing to perform comprehensive evaluations on opioid use disorder and opioid withdrawals; |
| i. | Failing to consider both risk-enhancing and protective factors; |
| j. | Failing to document decisions and/or reasons for choosing or not choosing any particular type of intervention, treatment, and/or assessment; |
| k. | Failing to explore overall needs in managing opioid use disorder and opioid withdrawals; and |
| l. | Failing to assess the degree of his opioid use disorder and opioid withdrawals. |

187. The Medical Defendants' negligence, as well as the negligence of other medical staff employed by AHN, increased the risk of harm to Zachary and was a cause in fact to the injuries he suffered and his resultant death.

188. The actions and omissions as outlined above were wanton, willful and/or taken in reckless disregard of Zachary's rights.

## COUNT X
## Medical Negligence
## (As to the Medical Defendants)

189. All paragraphs herein are incorporated by reference.

190. The Medical Defendants were immediately and directly responsible for providing medical treatment and services for Zachary and to provide those services to Zachary at ACJ.

191. At all relevant times, the Medical Defendants had a duty to provide Zachary with reasonable medical care for his opioid use disorder and opioid withdrawal.

192. In providing medical treatment and services to Zachary, it was the duty of the Medical Defendants to provide care consistent with the standards of reasonably competent medical providers.

44

193.    Notwithstanding these duties, the Medical Defendants committed one or more of the following negligent acts or omissions:

      a.    Failing to provide an adequate medical care plan for Zachary, including adequate treatment for his opioid use disorder and opioid withdrawal;

      b.    Failing to provide timely and thorough medical examinations of Zachary;

      c.    Failing to provide timely and adequately respond to requests for treatment;

      d.    Failing to properly document Zachary's opioid use disorder and opioid withdrawal;

      e.    Failure to properly monitor Zachary's opioid use disorder and opioid withdrawal;

      f.    Failure to properly monitor risk factors relating to Zachary's opioid use disorder and opioid withdrawal including dehydration;

      g.    Failure to properly implement a communication plan concerning Zachary's medical care;

      h.    Failure to ensure that Zachary was adequately hydrated; and

      i.    Failure to timely and adequately Timothy's opioid use disorder and opioid withdrawal.

194.    As a direct and proximate result of the Medical Defendants' failure to adequately provide medical treatment and care to Zachary during his incarceration at ACJ, Zachary suffered heart failure secondary to his opioid withdrawal leading to his death.

195.    The Medical Defendants' actions and omissions as outlined above were wanton, willful and/or taken in reckless disregard of Zachary's rights.

## COUNT XI
## Deliberate Indifference
## Under 42 U.S.C. § 1983
## (As to the Corrections Defendants)

196.    All paragraphs herein are incorporated by reference.

197.    Zachary had serious medical needs arising from his active opioid withdrawal which was worsened by his opioid use disorder that rendered him unable to independently manage his own healthcare.

198.    The Corrections Defendants knew that Zachary's opioid use disorder, coupled with his active opioid withdrawal, placed him in a high-risk category for serious medical needs and that this risk was obvious to someone in their position especially given his placement in ACJ's detox unit and identification card identifying him as a detoxing inmate.

199.    At some point in the early morning hours leading up to the discovery of Zachary's emergent medical condition, the Corrections Defendants saw that Zachary was in medical distress but ignored him.

200.    The Corrections Defendants were deliberately indifferent to Zachary's serious medical needs by failing to timely and adequately provide him with medical care and alert the Nursing Defendants.

201.    Zachary suffered conscious pain and suffering and death because of the Corrections Defendants' deliberate indifference, which was wanton and willful.

**COUNT XII**
**Deliberate Indifference**
**Under 42 U.S.C. § 1983**
**(As to the Paramedic Defendants and Dispatcher Defendants)**

202.    All paragraphs herein are incorporated by reference.

203.    Zachary had serious medical needs arising from his active opioid withdrawal which was worsened by his opioid use disorder that rendered him unable to independently manage his own healthcare.

204.    The Paramedic and Dispatcher Defendants were deliberately indifferent to known and obvious dangers to Zachary, and violated his rights under the Fourteenth Amendment of the United States Constitution by engaging in affirmative conduct that placed Zachary in greater danger, in one or more of the following ways:

      a.  In failing and refusing to provide Zachary with prompt medical attention for his serious medical needs including immediately dispatching the Paramedic Defendants in an emergent fashion rather than non-emergent to care for Zachary when John and Jane Roes 1-10 knew that Zachary was suffering from deadly complications from his severe opioid withdrawal, was struggling to breath, and vomiting which required an immediate emergency response,

      b.  In failing and refusing to promptly respond to ACJ to attend to Zachary's medical emergency, and/or

      c.  In failing to ensure that Zachary was safely and promptly transported to a hospital where he would receive necessary medical treatment to treat his opioid withdrawal.

205.    As a foreseeable and direct result of the actions and inactions of the Paramedic and Dispatcher Defendants as set forth in the paragraphs above, Zachary endured and suffered severe physical and emotional distress, his medical emergency was exacerbated which worsened to the point where he would never recover, and he died as a result.

## COUNT XIII
### Title II of the ADA, 42 U.S.C. § 12131, *et seq.*
### (As to the City of Pittsburgh and Pittsburgh EMS)

206.   All paragraphs herein are incorporated by reference.

207.   The City is a public entity as that term is defined in 42 U.S.C. § 12131(1).

208.   Title II of the ADA prohibits discrimination against people with disabilities in local government services and programs. Fire and paramedic agencies are covered because they are programs of local governments, regardless of whether they receive Federal grants or other Federal funds.

209.   At all times material, Zachary was a "qualified individual with a disability: as that term is defined in § 12131(2). He had a physical impairment that substantially limited one or more major life activities, had a record of such an impairment, and was regarded as having such an impairment. He was restricted in the major life activities of brain impairment. He was substantially limited to the extent that such activities were restricted in the manner, condition, or duration in which they are performed in comparison with most people.

210.   The City and Pittsburgh EMS had a policy and practice of not providing prompt and appropriate emergency medical service to people suspected of having opioid use disorder, such as Zachary.

211.   The City and Pittsburgh EMS failed to provide training to its dispatchers and medics to ensure equitable treatment of individuals with opioid use disorder. Defendants failed to train its dispatchers and medics on to how to provide prompt and appropriate lifesaving treatment to a disabled person or regarded as disabled by opioid

48

use disorder.

212.    At all relevant times The City and Pittsburgh EMS were aware of Zachary's disabilities through ACJ's emergency call, and the Dispatcher Defendants and the Paramedic Defendants' responses thereto.

213.    The City and Pittsburgh EMS damaged Zachary's estate in violation of 42 U.S.C. § 1211 and its accompanying regulations by committing the following discriminatory acts or practices:

    a.    In pursuing a policy that the City and Pittsburgh EMS should not provide an immediate emergency response to individuals with opioid use disorder suffering from complications associated with opioid withdrawal,

    b.    In failing to provide timely and appropriate emergency medical services to Zachary because of his disability including:

        i.    Designating ACJ's emergency call for Zachary as non-emergent,

        ii.    Taking approximately 25 minutes to respond to ACJ's emergency call for Zachary, and/or

        iii.    Taking approximately 55 minutes to remove Zachary from ACJ and transport him to the hospital.

214.    The City and Pittsburgh EMS harmed Zachary by failing to provide him with their services as alleged in the paragraphs above.

215.    Plaintiff is entitled to injunctive relief, including but not limited to, an order prohibiting The City and Pittsburgh EMS from continued discrimination against people with disabilities and an order mandating full compliance with Title II of the ADA.

216.    Plaintiffs are entitled to a declaration that The City and Pittsburgh EMS violated Title II of the ADA.

217.    Pursuant to 42 U.S.C. §§ 1988 and 2000e-5, Plaintiff is entitled to an award of attorney fees and costs incurred in the prosecution of this action.

**COUNT XIV**
**Disability Discrimination**
**Section 504 of the RA**
**(As to the City of Pittsburgh and Pittsburgh EMS)**

218.    All paragraphs herein are incorporated by reference.

219.    Zachary was a qualified individual with a disability or handicap under the Rehabilitation Act.

220.    Zachary was otherwise qualified to receive the benefit of the services made available by the City and Pittsburgh EMS.

221.    At all material times, the City and Pittsburgh EMS were and are recipients of Federal financial assistance for their programs and activities.

222.    The City and Pittsburgh EMS's actions and omissions as described in the above paragraphs violated Zachary's rights under the Rehabilitation Act by excluding him or denying him the benefits of their services solely because of Zachary's disability.

223.    The City and Pittsburgh EMS's conduct showed deliberate indifference to Zachary's rights.

224.    Zachary sustained emotional distress and damages due to the City and Pittsburgh EMS's violations of the Rehabilitation Act.

225.    Pursuant to Section 505 of the Rehabilitation Act, Plaintiff is entitled to an award of attorney fees and costs incurred in the prosecution of this action.

## COUNT XV
### Wrongful Death
### 42 Pa.C.S.A. § 8301
### (As to all Defendants)

226.    All paragraphs herein are incorporated by reference.

227.    Plaintiff claims the right to prosecute this action on behalf of the beneficiaries of Zachary's estate to recover all damages allowable under Pennsylvania's Wrongful Death Act, 42 Pa.C.S.A. § 8301, including but not limited to all pecuniary loss of any current or anticipated financial contributions from Zachary

## COUNT XVI
### Survival
### 42 Pa.C.S.A. § 8302
### (As to all Defendants)

228.    All paragraphs herein are incorporated by reference.

229.    Plaintiff claims the right to prosecute this action and recover on behalf of Zachary's estate all damages allowable under Pennsylvania's Survival Act, 42 Pa.C.S.A. § 8302 including but no limited to Zachary's pain, suffering, emotional distress, dread and apprehension of impending death, loss of life's pleasures, and loss of future earnings and earning capacity.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, as Administratrix of the Estate of Zachary Sahm, respectfully requests that judgment be entered in his favor and against Defendants as follows:

(i)     Actual and special damages as to all Counts,

(ii)    Compensatory damages as to all Counts,

(iii)   Punitive damages as to all Counts against the individual Defendants and AHN,

(iv)    Attorney's fees and costs as to all Counts, and

(v)     All other relief as this Court deems just and proper.

## **JURY TRIAL**

Plaintiff hereby request and demand a trial by jury.

Respectfully submitted,

**WILLIAMS CEDAR LLC**

/s/ Dylan T. Hastings
Dylan T. Hastings, Esquire
Gerald J. Williams, Esquire
Attorney I.D. Nos. 166672016, 36418
One South Broad Street, Suite 1510
Philadelphia, PA 19107
Phone: 215-557-0099
Facsimile: 215-557-0673
dhastings@williamscedar.com
gwilliams@williamscedar.com

Dated: June 12, 2025                    *Attorneys for Plaintiff*